Oral arguments, 15 minutes per side. Mr. Ford for the appellate. Good morning. Sammy Ford for the appellate, Dan Wilson. I have requested five minutes for a rebuttal. May it please the court, appellate Dan Wilson asks this court to overturn the summary judgment granted in the court below on two issues that have been presented. The first is whether the plan at issue in this case, the so-called Safelite plan, is an ERISA plan under section 2A2 of the ERISA statute. And secondarily, if the court determines that it is an ERISA plan under that section, whether it is a bonus plan and therefore falls outside of the scope of ERISA under the Department of Labor Regulation 29 CFR 2501.2-3. We're here on a de novo review of the court's grant of summary judgment. I would like to point out that this is an issue of first impression with respect to the determination of whether the Safelite plan or plans like it are, should be covered by ERISA. The fundamental issue in this case is whether plans that allow and contemplate for in-service distributions qualify under this subsection of ERISA. The only court that has gone in the opposite direction or that has addressed the issue and found the plan to be an ERISA plan is the Fifth Circuit's decision in Tolbert. As an overarching point, this court has acknowledged that ERISA creates a uniform regulatory scheme over employee benefits that's designed to protect beneficiaries and provide employers with uniform national standards of plan administrations. When interpreting whether a plan is covered by ERISA, there are three elements to consider. First is the plain language of the statute. The second is the plain language of the plan itself and also the surrounding circumstances are also given effect. This court, and therefore I'd like to start just from the plain language of the plan itself in this case. There is no dispute. The facts in this case are very straightforward. There's no dispute that this plan was created in order to allow the distribution of proceeds from a transaction incentive plan that existed, that Safe Flight created for a series of executives that was designed in order to encourage them to sell the company. And so this plan was designed to allow them to take those bonus incentives and defer some of the compensation so that they did not realize it all in the first year that they were due the money. There was no requirement that they defer until their termination. But they could, right? They could defer until termination, that is correct. And so can I take you to the first element, I'm sorry, that you mentioned in your three things to look at. So let's assume they could defer until termination. The language in the statute says results in the deferral of income. So results in, the way I read it, now you should tell me if I'm wrong, I read it as modifying the deferral of income. And then I read for periods extending to termination or beyond. And when extending to is used in the U.S. Code, we looked at every use of extending to in the U.S. Code. It either means includes or it means like extending to credit. So it's not credit here. So tell me why I'm wrong in thinking this results in the deferral of income and it extends to termination under the plain language of the plan. Sure. And you are correct in the sense that money that is placed in the Safe Flight Plan does get deferred by default to some period. The question is, and actually by default it is deferred to termination. However, the individual participants are allowed to receive that before. So when you read that language of results in. There's no, I mean, that's true. So your opponent points out in their brief that that's even true in 401Ks. I mean, you can always, so why doesn't your reading jeopardize 401Ks? It does not jeopardize 401Ks, one, because 401Ks have their own regime of when and how you are allowed to withdraw money from your 401K. This idea that. That's where I struggle. Because I don't see that exception in the language of Section 2 of the ERISA statute. Go ahead. And that's where I believe no court has actually looked at the remainder of Section 2A, which I think is very important and sort of illustrates what the deferrals are meant to accomplish here. And so the language right after subsections 1 and 2 states that a distribution from a plan, fund, or program shall not be treated as made in a form other than retirement income or as a distribution prior to termination of covered employment solely because such distribution is made to an employee who has attained age 62 and who is not separated from employment. The way I read that limiting statement is that it is clarifying that with respect to subsections 1 and 2, if you make a payment to someone who is in your employment but they have reached 62, that is okay under ERISA. If, to allow in-service distributions, as Safe Flight has argued, would essentially read out that entire section. You wouldn't need it. It's because you would be able to make payments. Why can't that be a clarifying addition? ERISA is a fairly intricate statute and 62 is a known and recognized time frame. And in some plans it's a time frame from which calculations are made. What I'm struggling with is the core concept of ERISA. Which is that someone who ERISA wants to designate as a fiduciary is using or holding or in charge of other people's money. And the goal of ERISA is to say we have this broad coverage. When you have someone else's money, we are going to say you are a fiduciary and you must take care of that money. And isn't this exactly that situation? Why does this not fit in exactly the danger that ERISA was created to address? Your Honor, I believe that the reason that that is not the case here is, again, as Safe Flight has argued, that the plan at issue is a top hat plan. Or was attempted to create a top hat plan, which erases the concerns I believe that Your Honor has with respect to the fiduciary duty obligations because of the narrow number of beneficiaries of the plan. But the very fact that ERISA includes an exception for a top hat plan tells you that what ERISA says is we are going to cover it all. You may fit within this narrow exemption and you have to be governed. First there has to be a fiduciary. So we don't even have to reach the top hat issue to recognize the purpose of ERISA to cover this vast arena of the use of other people's money. Your Honor, I believe that the issue that is presented here is so rarely raised and the reason that this would be only the Second Circuit Court to expressly reach this point is exactly because I believe that the concern that Your Honor has is just not one that ordinarily arises because this type of issue, this issue with respect to in-service distributions ordinarily or only would apply in situations such as this where you have a relatively limited number of plan participants. There are a number of plans that fall under ERISA where there is the opportunity for in-service distributions. And I think the other thing that strikes me is the importance in ERISA of having bright line rules because it is so difficult to understand what governs in ERISA and what CFRs, what regulatory things are in place. So the default is everybody is covered. If in fact what you try to do is say we are going to determine ERISA coverage based on what the participants in the plan choose to do, you create an untenable situation. It can't be based on the fact that I can say I want some of my money earlier. Judge Sipar wants his in ten years. Judge Rogers wants his over time and beyond his retirement because if you do that, it is an absolute inadministrable act. So what is so special about this act that it would hinge on what participants choose  Well, Your Honor, I don't believe that it necessarily does. I believe that you can look at the plain language both of the statute and of the plan itself. And in circumstances in which the plan allows for distributions before the age of 62 that are in service, it does not fit within the plain language of the statute. How do you respond to the distinction that Judge Sipar raises between the language in many other places and ERISA that is mandatory? This plan shall. To qualify, it is required to be. To does not say that. To is about an end result. It results in the deferral of for a period of termination, but for a period extending to termination. What else could that language practically mean? But the end result includes now and extensions until retirement. Your Honor, I read the temporal language in section two and also in section one as follows. With respect to one, income is something that we sort of understand as amounts that are regularly paid the way that individuals are usually paid. Section two allows for individuals to take whatever amount is in their pension plan as a lump sum upon termination or in periodic installments thereafter. So that's your argument out of your briefing that two really must also satisfy one. No, it does not need to satisfy one. I can't imagine because it's an or and it directs itself to two typically different forms of long term payments or long held money. One is retirement income. You get it after you retire. The other is a methodology that allows you to have income that results in over a time period that extends to the termination. Now tell me again why that is not completely distinct from what you and I would normatively think of as retirement income. Because Your Honor, first of all I believe that the practical effect of allowing the payments to be made from any deferral until termination effectively sweeps in any deferred compensation plan whatsoever into ERISA. And I don't believe that that is the intent. I don't believe that that's the understanding that all deferred compensation plans are ERISA plans or are governed by this section. And so therefore I believe that it really just allows the individual to make a determination which you can often see in terms of like pensions from large companies. You have to make a determination before you leave whether you want your pension in like a lump sum or if you want the company to continue to pay up. But you had to make a filing in this one, right? You had to make a filing to be in it. Even if you said zero, don't give me anything. You have to fill out that form. Every year you have to make the election for whether you want the distribution in the next year or at some point in the future. That is correct. But as I was saying, I believe that that is the fundamental distinction and it's one that is pretty common, which is allowing the individual to take their pension benefit either in a lump sum or as income or if they would like to take it over a period of years but not as income necessarily. So 25% at termination, 25% in year one, 25% in year two, and the final 25% in year three. What if in this group, you had a group of plan participants and at the beginning of the plan and for the first eight years of the plan, everybody said no money until after I retire. Then in the ninth year, one person says I want some money early. Was it qualified before and now it's no longer qualified? No, Your Honor. I do not believe that there is a change in or that there would be a change in this plan as a result necessarily of an individual's actions or behavior. I don't want to suggest that our argument is that an individual can somehow by their individual action take... You said it's because it could have happened. Right. The language allows for it to happen. That's the fundamental issue. Not that someone did or did not. We believe that the... Your position is in interpreting this really governing provision of ERISA, anytime someone can take money earlier than retirement, it is not governed by ERISA because it's not under one, it's not a retirement income, and it doesn't fit in your analysis under two. Unless it is made to someone age 62, which the statute expressly carves out as... That's a pretty sweeping interpretation of ERISA. Well, Your Honor, I believe this is the first time that the question of in-service distributions under this subsection has been raised, and I don't believe that just a plain reading of the statute along with the exception that the statute provides or causes a difference result. Just to be clear, you're saying that if the plan permits taking it out early, then it's not an ERISA plan, even if a lot of stuff is designed to be taken out later. It's just here's a plan, we'll hold it for you, anytime you want to take it out, you can take it out. People can take it out after one year while they're still working, people can take it out after three years while they're still working, people can wait until they retire and then take it out, or they can take it out later. You're saying that's categorically not an ERISA plan, is that right? Under the plain language of the statute, I believe... That's a yes or no? Yes. That's outside of ERISA. That's not the parade of horribles that the district court made, but it still seems like a potential gutting of ERISA protections, because if a company doesn't want to have ERISA apply to its plan, it just instead of saying you get it upon retirement or you get it after retirement, it can say you can take it out earlier if you want. Now that will screw up your tax planning, but that's not the issue, the issue is just what the document says, right? So if it says that, isn't that kind of an extreme interpretation of the intent of ERISA? I don't believe so, Your Honor, because especially under the terms that we are faced with plans such as this, it's not... Your argument is broader than just what this one is, right? Your argument that you've just stated is as long as there's an option to take it out early, whenever you want, which I guess there's tax reasons why you would never do that, but there's no other reason why you couldn't do that. There's no reason in employment law why you couldn't just say here's money, we'll give it to you whenever you want it. In the meantime, we'll keep it. Those categorically would not be ERISA plans under your theory, ERISA pension plans. Because, Your Honor, I do not believe that deferral of income by itself is sufficient to create an ERISA plan. And I believe that those are two sides of the same coin. Understand that, because the opposite, I'm going to ask him the other side, the opposite extreme argument, because it looks like rejection of that might be over-inclusive, but it sure seems like you've allowed a huge, I don't know if you want to call it a loophole or something. I mean, isn't it a gigantic loophole? Okay. Here's my other question, if I might. Judge Stranch talks about the protections of ERISA and what the purposes of it are, but here, if I'm understanding it correctly, you're representing the plaintiff, right? Yes, Your Honor. And you're wanting ERISA not to apply. Yes, Your Honor. And the other side is representing the defendant, and they're wanting ERISA to apply. So I'm wondering what the underlying reason is for this particular... And indeed, when the judge said you have to go under ERISA, you just dismiss your case. Is there something in ERISA that gives you less protection? Well, Your Honor... But ERISA gave you more protection. Well, Your Honor, there are, obviously, there are discussions with my client that would obviously be privileged, but just as a general matter, as we were discussing earlier, to the extent that a court would categorize this as a top hat plan, there are fewer protections for top hat plans than there are for ordinary ERISA plans, and therefore... You're worried that if you, or someone in your situation might be worried, and I don't want you to get into what your actual clients care about, but someone in your situation might actually be concerned that if ERISA applies, it'll come into some statutory exception in ERISA that'll give you fewer rights than if you just assume under your contract law? That is a potential argument, Your Honor. But I believe that... I mean, I think it's generally a fair question for me to ask in these cases. What are you trying to preserve, or what are the stakes? I'm having trouble seeing what the stakes are. We believe that the common law causes of action, with respect to these facts and sort of what occurred under, in the management of the Safe Flight Plan, more accurately are prosecuted under common law causes of action. And apparently your opposing counsel thinks the same way, because they're defending this pretty strongly. Okay. One other question. Under this interpretation that you propose, what happens to all the pension plans that allow an early withdrawal from pension, which so many of them do for emergency circumstances? That's a deferral and a distribution prior to retirement. Would all of those, with that exception, also fall outside ERISA? No, Your Honor. I believe that there may be other sort of categories in which some of those plans may fall. There may be welfare benefit plans. No, I'm not talking about a welfare benefit. I'm talking about a traditional pension plan. A welfare benefit plan doesn't pay you money. It provides you coverage. This is a pension plan issue, and most pension plans authorize an early withdrawal in named circumstances, most of which are familial crises. But they authorize it. Almost all of them do. Wouldn't they fall within the exception that you propose? Your Honor, I don't believe so. I believe that just as a general principle, what we are talking about here is just situations or plans in which early or in-service withdrawals are allowed all by themselves. There may be other circumstances under which either the Department of Labor or others would interpret or allow for certain distributions, which I believe are somewhat outside of the scope of just the issue of whether a plan that only allows for the distribution in service without anything more can come in. For example, there have been attempts, even though there's not been a lot of focus on the particular language of ERISA with respect to these sections, courts, to the extent that they have attempted to categorize plans as ERISA plans, have tried to fit the distribution or any sort of in-service withdrawal, at least as far as I've been able to determine, as retirement income, which I know is a little bit different than what Your Honor's question was, but I believe that the issue of the in-service distributions for the other purposes has just not been raised or I have not seen cases that address it. So you would then add to your argument a dividing line that is based on whether there's a conditional distribution versus whether there is a choice? Well, Your Honor, I would have to, those facts I believe would necessarily require looking at the particular plan and that's where I believe some of these issues of surrounding circumstances, et cetera, may come in. But for purposes of just the bright line rule, which as we've discussed and as Your Honor has said, there is a desire for clarity, you know, for purposes of determining whether or not a plan falls within ERISA, I believe that just as a matter of the language of the statute and the, as a whole, in-service distributions are not allowed to pension benefit plans. Thank you. Good morning. I'm John McAllen, Baker Hossettler, appearing here for Safe Flight Group and may it please the Court. The parties obviously offer two widely divergent views regarding the meaning of ERISA Section 3, which is one of ERISA's most fundamental concepts and a jumping off point for the statutory scheme itself, certainly as far as pension plans are concerned. It is broadly worded and intentionally so as illustrated by the repeated use of the disjunctive or in the statutory text and the key phrases such as for periods extending to the termination of covered employment or beyond, as Judge DePauw pointed out previously, and by its expressed terms, have significant meaning and cannot be conveniently glossed over. Why isn't this a bonus plan? I mean, why isn't this a bonus plan? The whole purpose of the plan was to give, to incentivize for employees to sell the company and give them a bonus and it had nothing to do with retirement. It had to do with deferring taxes and avoiding the tax consequence of taking the money right away. Well, Judge DePauw, there really were two plans involved here. There was the so-called transaction incentive plan, which the board set up in 2005 to provide incentives for the management team to maximize the value of the company and find a strategic buyer willing to pay the most for the company. And then there was the second plan, which was put in place at the end of 2006 after the buyer had been found and a definitive agreement had been put in place. But you agree with me. The whole point of the deferral was not to create a pension or retirement, but rather was to protect these high-level employees from the tax consequences of the bonus. It was certainly to protect them from the immediate tax consequences of closing, but its purpose was to allow them to defer for almost an indefinite period. That election, first of all, the default election was to pay 60 days after termination of employment, but then the individual could elect under Section 5.01B to either set a fixed period of time, it could be one year, it could be five years, it could be ten years, or to take it in installments over a period of up to ten years. And one of the things, call it factual context here, was the fact that when the plan was adopted in December 29th of 2006 by the board, they already had found a buyer. The buyer was a strategic buyer, Belron, out of Brussels, and it was expected that because there was a strategic buyer, which is the reason they got the price they got, was likely going to decapitate the management, was going to dismiss the management once they took over, once they closed. That's my point. The reason you have this deferral and this termination language is because of exactly that. It has nothing to do with retirement. And so if the primary purpose of the plan is the TIP plan is to give them bonuses and the deferral plan is to defer the tax consequences, then why shouldn't we look at what this plan really is, which is together it's a bonus plan. And Dillingham itself says you can look at the source of funding, which could be an external plan. Well, I would suggest to you that when you look at the plan in the context of the transactions, in the context of the facts, it actually was to provide an opportunity to defer into retirement, and by retirement I mean after termination of employment from Safe Flight. And there's a kind of a conceit here involved in characterizing Section 5.01B's kind of fixed period of time as permitting in-service withdrawals, but actually you could argue that it was to postpone distributions way beyond the expected termination of employment. Consider this. Yeah, because they anticipated being terminated upon the sale and consummation. Or within perhaps a period of months thereafter. So the default options say, okay, here's the history. They find a buyer. They put the sale of the company under definitive agreement in the fall of 2006. All of a sudden the management team brings to the board's attention a new deferred comp plan that is designed to defer payment of the expected bonuses if the deal closes in 2007. The default option was to pay in 60 days following termination of employment. So if, in fact, the buyer closes in April of 2007 and comes in and immediately pink slips all the management team, if they go with the default provision, they're going to get it in 2007 in the same tax year that they were going to get it anyway. So the whole point of 5.01B was to allow them to kick it downstream. It wasn't an in-service provision. It was actually a further deferral position beyond what was likely to be a termination of employment provision. So they could not take it in 2007. I could say I could postpone it for five years and get it in 2012. Way beyond. So how does that get characterized as an in-service provision? No, no, no. My point is that if you look at the primary purpose of ERISA, it's to protect people's pensions and retirements. The primary purpose here is to avoid tax cuts. ERISA was not set up to protect high-level executives' bonuses in essence. And so the primary purpose of the plan here was purely, I don't think anyone's disputing it, to avoid taxes. It wasn't to set up some retirement system for these high-level executives. So why should they get the protections of ERISA? Now, I agree with Judge Rogers this is a bizarre case in some sense because they don't want the protections and you want them to have it. I guess I should ask the Judge Rogers question, which is why? I mean, why do you want them to have the protections of ERISA and they not want it? What's going on here that we're all missing? Something. Pardon? Something's going on that we're all missing. Well, obviously we can't see into appellant's mind. But certainly we have a perception. Our perception of the situation is this, we believe that ERISA should apply because that was the whole point of setting up this plan and it expressly embraces ERISA. So as far as our client's concerned, it was certainty of outcomes. It was you set up an ERISA plan and that's the way the thing plays out. What has happened in reality, on the ground as it were, was that some of the deferral activities that were engaged in by the appellant triggered a tax section under Section 409A, which is in the tax code and certainly it doesn't exist in Title I of ERISA and was added to the tax code in 1994, many years later, but certainly in time for all of this to take place. And the ERISA remedies, ERISA provides the remedies that you get your benefit. You get your attorney's fees if you're successful, but you get your benefit. You get the benefit of your bargain. You get paid. And that's a substantial protection for employees. But I believe that what appellant seeks here is he would like to have this rather play out under state law because he believes that the remedies section gives him perhaps the right to a broader definition of damages that may sweep into the tax sanctions and some of the other issues that he seeks to recover on. So that's really what this is about. It might not be available under ERISA because it's not that plan. Exactly. And ERISA recognizes that there are certain plans that are not covered, primarily those that if they had flown into an actual retirement plan would no longer be tax qualified because they're top heavy. Top heavy. The top heavy, the 416 rules, yes, the date from 1982. I mean there's a couple things going on here in this case. And actually the concept of top hat plans I think we believe further reinforces our point about how ERISA section 3.2 sweeps broadly and, as you pointed out, Judge Strange, sweeps in all manners of plans through the disjunctives and then leaves it to section 4B of ERISA to completely exempt out certain things like workers' comp plans, foreign plans, governmental and church plans, and then leaves further to sections 201, 301, and 401 to selectively exempt out from some of ERISA's protections like participation, vesting, and eligibility. Certain plans like top hat plans. And for that matter, another one that I believe proves our point, which is IRAs that actually constitute employer-sponsored plans because the employer sets them up and contributes to them. I thought your colleague on the other side had a nice point, which was this one allows you, whereas all of those other 401ks, IRAs, to take it out early, there are conditions upon which you can take it out early. Whereas this one doesn't have any conditions. And so what he said is, and I simplified what he said much more eloquently, but the distinction is that those are conditional takeouts. Here you can take it out at liberty. Why isn't that something we should pay attention to? Because those kinds of plans have been around since before ERISA and before Congress wrote this statute. In 1974 and 73, when Congress put together this language and put Section 3.2A on the books, which notably, by the way, was before the age 62 rule, which is added in 2006 under the Pension Protection Act to deal with early retirement programs that employers were putting into place or were being encouraged to put into place. But back in the day, in 1974, some of the plans that Congress basically knew were out there were so-called savings, profit-sharing, and thrift plans. They didn't have 401k features because 401k came along in 1978 under the 78 Revenue Act. But back in the day, there were profit-sharing and thrift plans, and the IRS had a 20-year history leading up to that point. First articulated in Revenue Rule 54-231, 68-24, Revenue Rule 71-295, and Revenue Rule 71-224 that said you could have a tax-qualified profit-sharing or thrift plan, and all you had to do was to leave the employer contributions in the plan for a minimum of two years. There weren't tax sanctions. There was no can't take it out prior to 59 1⁄2. There was no 10% penalty. The Section 72 penalty for early withdrawal came along decades later. But back in the day, all you had to have, you could set up a qualified profit-sharing or thrift plan, and employees could take that money out if the plan would allow it. Take it out in two years, three years, five years. Heck, in 1981, I put together a profit-sharing plan for a corporate client, and it basically provided for three-year class vesting, another thing swept away by the 1986 Tax Reform Act. But the point was people would routinely carry those contributions for maybe three years or five years, and then systematically when they vested in those contributions, they'd pull them out. There was no 10% penalty. There was no thou shalt not or you have to have hardship. They'd routinely pull them out, and ERISA applied, and Congress knew those kinds of plans were out there in corporate America when they put this language on the books in 1974. So I take exception to the idea that there's all these restrictions. Not back then. I understand you correctly then in the hypothetical. You could have a plan where people just had a choice of, let's say a company says, up to $50,000 we'll pay you, and if you get more than that, you can take it now or you can take it any time later. You would say that sounds like the one you're describing, is that you can leave the money with the employer, he can reinvest it for you or not, and pay you later. Maybe you have a, I don't know why they might do that, but you've described something which is sort of similar to that. Well, the statutory scheme is a little more nuanced than that, Judge Rogers, in the sense that, and this gets back to this issue of qualified plans versus non-qualified plans. Qualified plans have to be funded, and they have to have tax exemptions to protect against people being taxed on money being put away for their benefit. And qualified plans also have to be kind of broadly based and have to adhere to a number of different provisions which kind of. I don't want to interrupt your answer completely. Sure, Judge. I want to have an understanding of the overarching issue again, is that the goal was to get, wasn't that and doesn't this apply here, that the goal was to draw all these plans in because not only was the Wild West existing before 74 as far as how people could use, put money in and take it out three years later. The real problem was that people were putting money into pensions for decades and all we had was cliff vesting and people were losing their jobs. They would have worked 25 years. They vest at 30. They're fired at 28. Yes. So the goal is to draw all of those various plans in so that you can then say, you can't cliff vest when somebody is ready to retire and get rid of them earlier. You have to vest over certain time frames. You have to step vest and you have to do this to be qualified. And to be qualified, you've got to be qualified because you've got to get the tax break. But the bottom line of all of those plans is you don't want somebody handling other people's money unsupervised. So the goal was to bring it all into ERISA and then ERISA does decide, Top Hat may not get these protections. You can have all these rules along the way. My struggle is to understand how we can articulate a rule that protects that core concept that people who take this money cannot throw it away without incurring personal fiduciary liability because that's what protects the people who are normally recipients. I know we're in a little different situation here, likely I think because it's a Top Hat issue and you lose some of the claims that you might otherwise have. Agreed. But we aren't talking about just a Top Hat claim here. That's really beside the point. The point is how does ERISA work? Right. And so that's the question. That's the question that I think has to be answered and that that's the question that 102.2a.2 addresses. Well, we believe that 102.2a.2 addresses it in the following context. It sweeps broadly. It sweeps so broadly that it includes any plan, fund, or program which by its expressed terms or as a result of surrounding circumstances, either one provides retirement income. We would submit that if you were looking at Romanet 1, it's beyond just pensions that pay monthly for life but that retirement income is income that you can use later after you've terminated employment and stick in an IRA or spend at that point in time. Or double Romanet that results in the systematic deferral of income to the periods, including termination of employment or beyond. So that it does sweep broadly. It leaves to, again, Section 4B and more importantly to Sections 201, 301, and 401. But I should ask you to pause and go back. I'm trying to ask a reverse Parade of Horribles question. We asked them Parade of Horribles and it looked pretty horrible. I figured my time was up. Okay, I understand. But his time was up too. It was not his fault. We had a lot of questions. Sure. This is Wilson's brief on page 18 I'm looking at. We're talking about whether the simple possibility of deferral standing alone is sufficient. And it sounds like your argument is that the simple possibility of deferral standing alone is sufficient to put whatever causes that deferral under ERISA. No, we don't. So if you have some kind of, I was trying to hypothesize one but it started to sound silly. But there's got to be some situations where some employer might want to just offer to pay you later rather than to pay you now. Okay, I'll take that. No, nothing about termination. Maybe it only lasts for three years. We will pay you now for this particular income that you're getting. Or if you want, we can pay you in one year or we can pay you in two years or we can pay you in three years. I don't know why they would do that, but it seems like they ought to be able to do that without triggering ERISA. But you would say it does trigger ERISA, is that right? No, I believe that the appellant's brief, we believe, overstates our argument. Well, what is he? I'm just telling you where I got the idea. No, no, I understand. My question is just a optional deferral of present income. Right. An optional deferral. No mention, maybe none of them are even thinking about retirement. They've got all these young people and some of them, you know, they're spendthrifts or something. I don't know. We believe that ERISA does have meets and bounds and that a simple deferral plan, a deferred comp plan that would defer payment for a short period of time. Anyone can terminate. If you would let me complete my thought, Your Honor. Sorry. That a short-term deferral of payment that under the circumstances, i.e., when promised to a group of people, where clearly they all or substantially all of them, barring the inconceivable like death or an early termination of an isolated individual, would pay out, certainly while they're employed or while they all were still employed, would not constitute an employee pension benefit plan subject to ERISA. And we don't believe that the statute requires that result. Why do you square it with all of your arguments today, though? That's my question. We have not. We have talked about, with respect, Your Honor, we have talked about how Section 32A, double I, results in a deferral of income to periods, including the termination of employment or beyond. And if, in fact, you're talking about making a promise to a roomful of 32-year-olds, the young people in your description, in your hypothetical, where payment would be postponed for a couple of years, maybe even three years, where they'll all be in their mid-30s and likely all still employed by the same company making the promise, that that would not rise to the level of a deferral of compensation to periods, including the termination of employment or beyond, because the termination of employment really wasn't within the contemplation of the promise. And that kind of leads me to circle back to kind of a broader context in the facts of this case, which is it bears remembering how this promise came to be made, to whom it was made, and what the likely outcome was, i.e., this was an end-of-the-year 2006 plan put into effect for a small group of executives who expected to close on the deal in April of 2007, about three or four months later, knowing that they were selling to a strategic buyer who was likely to pink slip all of them either immediately or soon thereafter. And it provided them with an opportunity to either get paid 60 days later, which would have accomplished nothing, or to make an election to get paid years later, which accomplished something, i.e., Section 5.01B was designed to give them a period where they could be sure to defer to a period beyond termination of employment. It's a thoughtful and responsive response. It wasn't an in-service provision. Here's my concern, is that you're not asking for a bright-line rule now. You're just saying on the facts where we have fact, you just listed them, fact one, two, three, and four, this is not an ERISA program, or I'm sorry, this is an ERISA program. But if you change the facts a little, or maybe a lot, it might not to. So what you're asking us, in effect, to do is not to have a bright-line rule, but to have a fact-intensive rule in situations where there is a discretionary deferral. Is that right? I mean, it's a more defensible position, but it's a lot harder to write the opinion. Well, I guess I would suggest that there is danger in going too much in the other direction, and it creates the sort of slippery slopes that Judge Strach was pointing out previously, which is it provides an opportunity for mischievous individuals to create short-term plans and avoid ERISA generally. The parade of horrors that we came up with while we were conceptualizing the brief included a situation where an employer could set up a 401k plan, take everybody's money for a couple years, with the idea that ERISA would apply, discover to their horror that the guy hired his brother-in-law to manage the assets. He screwed them up, and now after the lawsuit got filed, somebody gets the bright idea that since everybody's covered by the plan is still employed, if you just terminate the plan and give the money to them while they're still employed, maybe you get out of the ERISA claims. I understand. I'm just trying to find out what you're suggesting the line should be, and the line apparently is not just a clear, bright line. Life's simple when there are clear, bright lines. The line that you're suggesting to us is a nuanced, fact-laden line that looks at all the kinds of things that you just listed were present in some hypothetical that aren't present here. Right, and I think it is a facts-based line, and I think this is why the language of by its expressed terms has meaning in that statute that we're debating today, which is if you think about the fact of how the statute reads, which is a plan could by its expressed terms provide retirement income or result in the deferral of income to periods including the termination of employment and beyond, and you consider the four-factor test that courts commonly use when they're wondering whether or not a plan is a plan under Donovan v. Cunningham, which this court has embraced subsequently. You can ascertain the source of payments, the source of benefits, the class of eligible individuals, how to apply for them. All of that goes back to when the parties establish a plan, it should play out based on the reasonable expectations of what they've set up for themselves, and in this particular case, this plan embraces ERISA. There was no secret. It talks about federal law and everything else, and all we're suggesting is yes. I was just asking whether there was a clear line here that you were asking us to draw, that if there's a possibility of deferral going beyond retirement, that ERISA covers. It seems to me your answer is now pretty clearly that that's not what you're asking us to do. No. You're asking us to say if it looks like all of these factors apply, then ERISA does or does not apply. There is a contextual aspect. I wasn't asking you to apply that standard. And we would submit that that contextual line has now been around for a good 45 years, and people seem to be able to work with it okay. One of the reasons, I think, that this is a case of first impression, or at least been characterized as such by the appellant, is because people seem to be pretty comfortable with how that line worked in practice until somebody decided to take a run at it today. Okay, thank you. Thank you. Thank you. Just a few follow-up points, Your Honors. With respect to the categorization of profit-sharing plans as ERISA plans, which my colleague was discussing earlier, there is and there has been a series of cases recently that have looked at attempts to create profit-sharing plans that courts, other circuits have expressly rejected as ERISA plans. That is Rich v. Schrader and Pasternak v. Schrader, they both were analyzing a profit-sharing stock plan that was created by Booz Allen Hamilton. Both of those cases were decided after October as well. They're pretty recent cases. So the suggestion that profit-sharing plans get swept into ERISA under these sections, I believe, is not supported by the weight of the case law. Another issue that we were discussing before was this concept of what does determination or beyond mean as opposed to the retirement income. And I believe that if, like, that is where we have to look at the plain language of, you know, income as opposed to beyond. So in other words, the reading that beyond is something other than the lumpy payments that we were discussing, you know, earlier I think would be undermined by the fact that Section 1 automatically sweeps in plans that provide retirement income. So in other words, the suggestion, which I made earlier, is that either you get paid in the same way you are usually paid when you're an employee or you take it out in lump sums but not necessarily one lump sum, which we believe begins at termination. The other item that came up, Judge Stranch, you were asking about plans that allowed for hardship exceptions. My understanding is that the plans that you are concerned about would be 401K plans because those are the plans that I am aware of that allow for hardship withdrawals. They're not the only plans that allow for them. There are a number of DB, defined benefit plans, that have an authorization for a hardship withdrawal. And my suggestion would be that sort of like with 401K plans, there is yet another statutory and regulatory regime that governs those, and we're very familiar with the requirements of the 401K, which is why I believe the suggestion is well taken, that if a regulation or a statute provides for means to withdraw before termination, then of course I would submit that that controls. But I believe in the absence of the regulation or statute, the default... The regulatory item that you're referencing is a component of ERISA. Wouldn't it have to fall into that in order to... I'm struggling with the concept that you're presenting because so much of the regulation grows as a result of ERISA. So you're in the plan, and now you have the regulatory requirements, some of which exempt you. I see those as further exceptions, Your Honor, a lot like the exception that is provided in the statute itself that allows for these withdrawals at 62, that does not categorize a withdrawal at 62 as either retirement, or that allows it to be categorized such that it doesn't run afoul of Sections 1 or 2. I believe that those exceptions would provide a similar basis for a withdrawal. The only basis. Your argument, the only basis. Unless there is a written statutory or other basis for the withdrawal, I believe that is the case. And it's inadequate that the plan document is written with a default, that monies will not be provided to you until termination of employment, that that's the default option. Your Honor, I do not believe that that undermines the argument that the in-service distribution by itself, under these circumstances where there is no exception, I believe that with the in-service distribution, that runs afoul of Section or subsection 2 of ERISA. Thank you, Your Honor. Thank you. We appreciate your briefing and your arguments have been very helpful to this complicated case. We will take it under advisement and render an opinion in due course. That's the last argument case. You may adjourn court.